UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVE WILLIAMS FAULK,

           Petitioner,                          Case No. 09-cv-14130

v.                                  HONORABLE STEPHEN J. MURPHY, III

JEFFREY WOODS,

           Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF
## HABEAS CORPUS AND DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY

This is a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner Dave Williams Faulk, a Michigan state prisoner, was convicted in 2006 by an Oakland County jury of first degree home invasion, larceny of a firearm, felon in possession of a firearm, and three counts of possession of a firearm during the commission of a felony. On August 31, 2006, Faulk was sentenced as a fourth habitual offender to concurrent prison terms of 10 to 25 years for the home invasion conviction, 58 months to 25 years for the larceny of a firearm conviction, and 4 to 25 years for the felon in possession conviction; to be served consecutively to three concurrent two-year prison terms for the felony-firearm convictions.

In his petition, Faulk asserts five claims for habeas relief:

I.    Faulk was denied due process of law because there was insufficient evidence presented at trial to support his convictions.

II.    Faulk was denied due process of law because he did not receive a fair trial when the trial court failed to provide the jury with a cautionary accomplice instruction, in plain error.

III.    Faulk was denied due process of law because he did not receive a fair trial when the prosecutor engaged in misconduct by: (A) essentially forcing Faulk to comment on the credibility of prosecution witnesses; (B) making a absent witness an accessory to a crime with no evidence in support; (C) failing to disclose impeachment evidence and correct false testimony; and (D) making statements in his closing arguments unsupported by evidence.

IV.   Faulk was deprived of the effective assistance of counsel when his trial attorney failed to :(A) interview and call witnesses for the defense; (B) investigate, obtain, and produce plea agreements for impeachment purposes; or (C) properly cross-examine prosecution witnesses.

V.   The cumulative effect of the errors deprived Faulk of a fair trial under the federal constitution.

Petition for Habeas Corpus ("Petition") at 4, ECF No. 1.

Respondent Warden Woods, through the Michigan Attorney General  ("Woods"), argues in his response that the first and fourth habeas claims are without merit, the second and fifth claims are either not cognizable on habeas review or procedurally defaulted, and the third habeas claim is procedurally defaulted. Resp. to Petition at 3-4, ECF No. 4.

Upon review of the entire record, the Court finds that Faulk has failed to establish a right to habeas relief and will therefore deny the petition.

## STANDARD OF REVIEW

When reviewing a petition for habeas corpus challenging custody stemming from a state conviction, a federal court must consider the following standard of review:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of

law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. Examining a state court's legal application is a deferential standard; a court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

## BACKGROUND

As recited by the Michigan Court of Appeals, "[d]efendant [Faulk]'s convictions arise from his involvement in leading a group of four juveniles in an activity known as 'garage hopping,' i.e., stealing items out of open garages. Each of the four juveniles testified against defendant at trial. According to their testimony, defendant entered one garage and stole three hunting rifles from a vehicle parked in the garage." *People v. Faulk*, No. 273688, 2008 WL 747083 at *1 (Mich. App. March 20, 2008).

The victim, Jerrel Vickers, was at home with his wife on Topsham Road in Rochester Hills, Michigan, on the evening of November 9, 2005, packing his SUV for a hunting trip. The SUV was parked in an attached garage, and Vickers left the garage door open while he packed. Among the items packed for the trip were a briefcase in the front seat of his car and three rifles in the back seat. At approximately 8:00 p.m., Vickers noticed that the rifles and briefcase were gone. He promptly called the police. Trial Transcript ("TR") Volume I at 217-236, ECF No. 5-5.

Justin Roach testified that in November of 2005, he was 16 years old and lived in the same trailer park as Faulk. On the night of November 9, 2005, Justin was at the trailer park

at the house of a friend, Joyce, along with Carl Holcroft, Paul Evans, Nate Collett, and Faulk. Faulk asked Justin to drive him to Faulk's mother's house on Topsham Road in Rochester Hills, about eight miles away. After receiving permission from his mother, Justin drove Faulk, along with Carl, Paul, and Nate. When they arrived at Faulk's mother's house, everyone got out of the car and waited while Faulk attempted unsuccessfully to enter the house. Faulk then asked the group if they wanted to go "garage hopping" – that is, looking for open garages and stealing property. Faulk offered the boys $1,000 each. They agreed, and found a house with an open garage door within a few houses of Faulk's mother's house. Justin saw Faulk open the back of an SUV in the attached garage and take three guns and a briefcase. They carried these to the tree line and hid them under some bushes. A grinder was also taken from another garage. The group picked up the items and started walking towards Faulk's mother's house when they were stopped by a police officer who ordered them to the ground. The officer had a dog with him. Justin and Paul dropped to the ground, while Faulk, Nate, and Carl ran away. Justin told the officer that there were three other people. He gave a written statement and was charged in juvenile court with first degree home invasion and larceny of a firearm. His case was later placed on the consent calendar.[1] Tr. Vol. I at 254-300.

Carl Holcraft testified that in November of 2005, he was 14 years old and lived in the same trailer park as Faulk, and knew Faulk slightly. On the night of November 9, 2005, Carl was at his aunt Joyce's house in the trailer park with Faulk, Paul Evans, Nate Collett, and Justin Roach. Carl testified that Faulk offered each of the boys $1,000 to go garage

---

[1]The consent calendar offered the juveniles an opportunity to avoid jail time, and eventually have their convictions expunged, provided they cooperate with authorities, including testifying at Faulk's trial.

hopping in Faulk's mother's neighborhood. Justin drove the group to Faulk's mother's house in Rochester Hills. The group was unable to get into Faulk's mother's house. They then walked up the street and found a garage door open. Faulk told the boys to stand behind the house and watch. Faulk then went into the garage. He came out with guns and a briefcase, and handed them to the boys. They went into the woods to stash the items and then went on to look for other houses. At some point, they retrieved the guns. They were walking toward the car when the police came. They dropped the guns. Justin and Paul dropped to the ground, while Faulk, Carl, and Nate ran. Faulk told Carl and Nate that he was on probation and they should go on their own. Faulk ran straight, while Carl and Nate went right. Carl and Nate kept running, and were eventually caught in a nearby yard after asking a homeowner to use the phone. Oakland County Sheriff deputies placed Carl and Nate in handcuffs and put them in separate patrol cars. While there, Carl saw Faulk's girlfriend in a car. Carl observed deputies take Faulk's girlfriend out of the car, put her in handcuffs, and take her to the police station. Carl was interviewed in the presence of his father by Detective Buffa and made a written statement. Carl pled guilty in juvenile court to home invasion and larceny of a firearm and was placed on the consent calendar. Trial Transcript Volume II at 5-59, ECF No. 5-6.

Nathan Collett testified that in November of 2005, he was 16 years old and was staying at the same trailer park as Faulk for a few days while his mother was out of town. On the night of November 9, 2005, Nate met Faulk while he was hanging out in Paul's trailer. There were three other kids present, but Nate testified that he couldn't remember their names. One kid drove them to Faulk's mother's house for a party. When they arrived at Faulk's mother's house, they couldn't get in. Faulk then asked if the others wanted to go

5

break into cars, and offered them money; everyone agreed. The group walked in the neighborhood looking for cars. Faulk removed three guns and a black bag from a car and handed them to the others. The group left the guns and bag in the woods and went around looking for some more cars. They eventually returned to where the guns and other items were, picked them up, and started walking toward the car. Nate was carrying the grinder; Paul, Carl, and Faulk were carrying guns; and Justin had the black bag. Then they encountered a police office with a flashlight who ordered them to freeze. Nate, Carl, and Faulk ran, while the other two stayed. Faulk told the other two to go in another direction, while Faulk ran toward a barn. Nate and Carl knocked on the door of a house and asked to use the phone. While they were waiting, the police arrived and arrested the two boys. They were taken to the police station. Nate's mother was out of town, so he was released that night without giving a statement. He later returned to the station with his mother and gave Buffa a written statement. Nate couldn't read so his mother wrote the statement for him. Nate later pled guilty in juvenile court, and was placed on the consent calendar. Tr. Vol. II at 60-105.

Paul Evans testified that in November of 2005, he was 15 years old and lived in the same trailer park as Faulk. On the night of November 9, 2005, Paul was at Joyce's house with Faulk, Justin, Nathan, and Carl, when Faulk offered the boys money to go garage hopping at Faulk's mother's house. The group drove in Justin's car. When they arrived, they knocked on the door but no one was home. Faulk tried the handles on all the doors and tried to open a window, but all the windows were locked. They then started to walk around the neighborhood to look for open garages. Up the street, they found an open garage. Faulk entered the garage, while Paul acted as lookout. Paul saw Faulk come out of the

6

garage with three guns and a suitcase. Faulk handed these items to the others, and they stashed them in the woods. The group then continued to walk around. They came back, picked the items up, and started walking towards Justin's car. Paul was carrying the briefcase. They saw a bright light, heard a dog barking, and then Paul and Justin were on the ground in handcuffs. Paul later gave a written statement to the police, pled guilty in juvenile court, and was placed on the consent calendar. Tr. Vol. II at 106-156.

Ilene Faulk, Faulk's sister, testified that she was home alone in her mother's house in Rochester Hills on November 9, 2005 when she heard a knock on the front door at about 7:30 p.m. She didn't answer the door because, she said, she had a feeling it was Faulk, there were other people with him, and her mother said Faulk wasn't welcome to come into the house when she was gone. Ilene then heard Faulk and other people come up to the sliding kitchen doors in the rear of the house. Ilene sat down on the kitchen floor behind an island. The dog was barking and she heard Faulk tell the dog to be quiet. She looked through the blinds and saw Faulk sit at a table outside. She only saw Faulk at the table, not anyone else. He talked on a cell phone for a while and then left. Some time later, representatives from the sheriff's department arrived. They asked Ilene to notify them if Faulk returned and to let him into the house. Some time later, Faulk arrived at the kitchen door. Ilene let him in, and then went into another room of the house and called the police. Faulk left the house through the back door when the police arrived and he was arrested on the deck. Tr. Vol. II at 187-216.

Deputy Stoner of the Oakland County Sheriff Department testified that he arrived on the scene with his K-9 dog at about 9:25 p.m. on the evening of November 9, 2005. The dog tracked a scent from the Vicker's garage at 2533 Topsham to the rear deck of Faulk's

mother's house at 2565 Topsham. While Stoner's partner investigated the house, Stoner continued to track with the dog. Some distance away, Stoner saw the silhouettes of four people dressed in dark clothing carrying what appeared to be long rifles in cases. Stoner ordered them to stop and drop the items. Two of the subjects stopped while the other two ran into the tree line area. After the subjects were secured, Stoner continued to track with the dog. The dog found a discarded grinder, a black jacket, and a glove in a yard on Hillcrest street, and a baseball cap in the yard of a house on Pleasant View. Tr. Vol. II at 217-259.

Detective Buffa of the Oakland County Sheriff Department, the officer in charge, testified that he met with Paul, Justin, Carl, and Nate at the station sometime between 10:30 and 11 p.m. The boys were placed in four separate interview rooms. Buffa had the boys call their parents and tell them why they were there. Nate's mother was out of town, so Buffa got a number for Nate's aunt and had her come to the station. Buffa spoke to the parents, gave them a brief description of what happened, and asked them to speak to their children. The parents were led into the interview rooms and given the opportunity to speak to their children. Buffa then went into each of the interview rooms, read the boys and their parents the *Miranda* warnings, and obtained statements from Paul, Justin, and Carl. Buffa did not obtain a statement from Nate at that time because his mother was out of town and Nate had learning disabilities. Buffa took a statement from Nate one a week later, in the presence of Nate's mother. About two weeks later, Buffa went to the Oakland County Prosecutor's office to seek charges against the boys. The boys were charged in the juvenile justice system with first degree home invasion and larceny of a firearm. All four pled guilty and were sentenced to the consent calendar. Buffa testified that each boy told him that

Faulk had promised them money to go garage hopping, but acknowledged on cross examination that this was not in the boys' statements or in his report. Tr. Vol. II at 260-288.

Faulk testified that he had gotten into an argument with his girlfriend Lauren earlier in the day of November 9, 2005. Later that day, he went to his friend Joyce's house to look for a ride to his mother's house, so that he could walk to his girlfriend's house and set things straight. Faulk couldn't drive himself because his license had been suspended. Faulk told Justin that he could give him gas money when they got to Faulk's mother's house. Justin agreed, and drove Faulk to his mother's house, along with Paul, Carl, and Nate. When they arrived at Faulk's mother's house, Faulk told them to wait in the car while he went in to grab some money, but the boys got out of the car and followed Faulk. Faulk tried several doors, but all were locked, and it looked like no one was home. Faulk used one of the boys' cell phones to call his brother, but was told his brother was at a party. Faulk told the boys that he couldn't get into the house because his parents weren't home, and decided to walk to his girlfriend's house, a thirty to forty-five minute walk. Faulk left the kids outside his mother's house. When Faulk arrived at his girlfriend's house, he could see from the window that she was eating dinner with her parents. He sat on the porch for a while, and eventually left, without letting her know he was there. While he was walking back to his mother's house he heard yelling and a dog barking, heard the sound of the boys throwing things on the ground, and saw Nate and another of the boys running toward him. They said they had been stealing things from a garage on his street. He told them that he was on probation and ran a distance trying to get away from them. The boys followed him and asked him which way was home; he pointed, and they separated. Faulk dropped his jacket while running. He  eventually returned to his mother's house and was arrested as he left

9

through the back door. Faulk testified that while he was at the sheriff department, Buffa told him that he was going to take the blame because it was more expensive to lock up four juveniles than one adult. Faulk denied offering the boys money for stealing and denied being involved in the theft. Trial Transcript Volume III at 5-62, ECF No. 5-7.

On rebuttal, Buffa denied telling Faulk that he wanted to blame the crime on him and denied telling Faulk that it cost more to lock up four juveniles than one adult. Tr. Vol. III at 63-68.

Faulk was convicted of all counts and sentenced on August 31, 2006. He filed timely direct appeal through appointed counsel and also filed a supplemental brief in pro per.

In his direct appeal, Faulk made two claims of error through counsel:

I. The trial court committed plain error by failing to provide the jury with a cautionary accomplice instruction and deprived Faulk of a fair trial.

II. The prosecutor committed misconduct by requiring Faulk to comment on the credibility of the prosecution's witnesses.

Faulk also raised eight additional claims of error in a supplemental in pro per brief filed pursuant to Michigan Administrative Order 2004-6, Standard 4:

I. Whether there was probable cause to arrest the defendant without a warrant after a 78-day delay and whether that delay denied the defendant due process.

II. Whether the withholding of material evidence against defendant until days before the trial denied him due process and a fair trial.

III. Whether there was sufficient evidence to convict defendant on the six charges.

IV. Whether the prosecutor committed misconduct by making an absent witness an accessory to the crime when there was no evidence to support the charge, and therefore created an injustice because the witness could not answer the charge.

V. Whether the prosecutor's conduct denied defendant his right to a fair trial.

VI.    Whether the prosecutor denied the defendant the right to a fair trial by making statements in closing arguments that were unsupported by the evidence.

VII.   Whether the defendant's counsel was ineffective and denied defendant the right to a fair trial.

VIII.  Whether the cumulative effect of multiple errors denied the defendant a fair trial.

The Michigan Court of Appeals affirmed Faulk's convictions in an unpublished, *per curiam* opinion, *People v. Faulk*, No. 273688 (Mich. App. March 20, 2008). The Michigan Supreme Court denied leave to appeal in a standard order. *People v. Faulk*, 483 Mich. 880 (Jan. 27, 2009). Faulk filed this petition on October 20, 2009.

## DISCUSSION

I.   <u>Habeas Claim 1: Insufficient Evidence</u>

Faulk's first habeas claim asserts that there was insufficient evidence to support his conviction. Faulk argues that the evidence of his guilt was insufficient because the crucial evidence against him came by way of testimony by Justin Roach, Paul Evans, Nathan Collett, and Carl Holcroft, juveniles who were apprehended by the police with the stolen property; and who were offered plea bargains, promises of no jail time, and expunged records in exchange for their testimony against Faulk. Petition at 15-16. He points out that no one other than these boys ever witnessed Faulk committing any criminal activity. He points out that, contrary to the testimony of the boys, Deputy Stoner testified that he saw four, not five, people carrying items and that he saw two, not three, people flee. He points out that the boys' testimony is conflicting in many instances, particularly with regard to which boy was carrying which item. *Id.* at 17.

In sum, Faulk argues that the State's evidence is insufficient because it consists of:

Three totally different versions of the same incident by the State's key witnesses. Witnesses who were caught with the stolen property, who all pled guilty to the charges, all received leniency for their cooperation with expungement of their records and to receive no jail time in return for testifying against Faulk.

*Id.*

The Michigan Court of Appeals rejected this claim on direct appeal:

Defendant does not argue that the juveniles' testimony was insufficient to establish the elements of each of offenses of which he was convicted. Instead, he argues that the juveniles were not credible because they had a motive to blame him and there were inconsistencies in their testimony. When reviewing a challenge to the sufficiency of the evidence, however, we are required to view the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could find every element of the crime proven beyond a reasonable doubt. *People v. Petrella*, 424 Mich. 221, 268-270 (1985); *see also People v. Hampton*, 407 Mich. 354, 368 (1979). The resolution of credibility disputes is within the exclusive province of the trier of fact. *People v. Vaughn*, 186 Mich. App 376 (1990). Viewed in this manner, the juveniles' testimony was sufficient to convict defendant of each of the crimes charged beyond a reasonable doubt.

*Faulk,* 2008 WL 747083 at *5.

Thus, as the Michigan Court of Appeals rejected this claim on the merits, habeas relief is available only if the decision of that court was an unreasonable application of clearly established federal law or was based on an unreasonable construction of the facts. *See* 28 U.S.C. §2254; *Williams*, 529 U.S. at 405-06.

The U.S. Constitution requires that a criminal defendant be convicted only on sufficient evidence to establish the elements of the crime beyond a reasonable doubt. In order to establish a constitutional violation, a habeas petitioner must show that, after viewing the evidence offered at trial in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The standard "leaves

juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inference from basic facts to ultimate facts.'" *Coleman v. Johnson*, __ U.S. __, 132 S. Ct. 2060, 2064 (2012) (quoting *Jackson*, 443 U.S. at 319). When reviewing a state court's determination of sufficiency of the evidence, a federal court is not to reweigh evidence, reevaluate the credibility of witnesses, or substitute its judgment for that of the jury. *Johnson v. Mitchell*, 585 F.3d 923,  931 (6th Cir. 2009). And when a state court has already rejected a sufficiency of the evidence challenge, a federal habeas court may overturn that decision only if it was objectively unreasonable. *Cavazos v. Smith*, __ U.S. __, 132 S. Ct. 2, 3 (2011).

Faulk does not argue that the testimony of the juvenile witnesses is insufficient to establish the elements of the crimes. Instead, he argues that the testimony is insufficient to link him to the crimes because it is based on testimony that is biased, not credible, and contradictory. Petition at 17. The question whether the jury should have disregarded the direct testimony of the witnesses, however, is beyond the scope of the federal court's authority on habeas review. *See Johnson,* 585 F.3d at 931-32 (habeas court may not reweigh the evidence adduced at trial, determine certain witnesses should not be deemed credible, or substitute the federal court's judgment for that of the trial court). The testimony of the four juveniles established the essential elements of the statutory offenses for which Faulk was convicted. The jury determined their testimony to be credible, and this determination cannot be challenged on habeas review. The Court finds the Michigan Court of Appeals opinion reasonably applied *Jackson* in rejecting Faulk's sufficiency of the evidence claim. Faulk is not entitled to habeas relief on his first claim.

II.   Habeas Claim 2: Failure to Instruct the Jury on Accomplice Testimony

Faulk's second habeas claim asserts that his due process rights were violated when the trial court failed to give a *sua sponte* cautionary instruction on the unreliability of accomplice testimony with regard to the testimony of juveniles Justin, Paul, Nate, and Carl. Petition at 24.

A claim that a trial court failed to give a jury instruction is not cognizable on federal habeas review unless the omission "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 154  (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

Wood argues Faulk procedurally defaulted on this claim because Faulk's trial counsel expressed agreement with the jury instructions, and the Michigan Court of Appeals relied upon this agreement when declining to review Faulk's jury instruction claim. Resp. to Petition at 18. Faulk argues in response that his trial counsel was constitutionally ineffective in agreeing to the jury instructions absent a cautionary accomplice testimony instruction. Petition at 24. Attorney error can constitute cause to excuse a procedural default, but only if the error rises to the level of constitutionally ineffective assistance of counsel. *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994).

Analyzing whether an attorney's failure to raise or preserve claims constitutes ineffective assistance requires an analysis of the merits of the claims a petitioner asserts should have been, but were not, raised or preserved. While the procedural default doctrine precludes habeas relief on a defaulted claim, it is not jurisdictional. *Trest v. Cain*, 522 U.S. 87, 89 (1997). Judicial economy sometimes counsels reaching the merits of a claim or claims if the merits are "easily resolvable against the habeas petitioner, whereas the

procedural-bar issues involve complicated issues of state law." *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997). Here, determining whether Faulk's trial attorney was constitutionally ineffective for failing to raise Faulk's jury instruction claim during trial requires the Court to reach the merits of Faulk's habeas claims, because in order to show that counsel was ineffective for failing to raise a claim, Faulk must show that the claim would have succeeded if they had been raised by counsel. In such a case, the cause and prejudice analysis merges with an analysis of the merits of Faulk's habeas claim, and the Court finds it easier simply to consider the merits of Faulk's habeas claim. *See Arias v. Hudson*, 589 F.3d 315, 316 (6th Cir. 2009) (the *Lambrix* holding permits courts to skip procedural default issues and reject claims on the merits where the merits present more straightforward grounds for decision).

Even assuming no procedural default, Faulk's jury instruction claim does not provide grounds for habeas relief on the merits. The Sixth Circuit Court of Appeals recently considered and rejected an identical accomplice instruction claim in *Young v. Trombly*, 435 Fed. Appx. 499 (6th Cir. 2011). In *Young*, the petitioner argued that he was denied due process by the trial court's failure to give the same cautionary jury instruction Faulk contends should have been given in his trial. The Sixth Circuit held that the failure to give a specific accomplice jury instruction does not violated a criminal defendant's federal constitutional rights where the instructions as a whole both inform the jury regarding credibility and alert the jury as to what is properly considered when determining credibility. *Young*, 435 Fed. Appx. at 504 (*citing Goff v. Bagley*, 601 F.3d 445, 470 (6th Cir. 2010)).

In Faulk's trial, the court instructed the jury as follows:

As I said before, it is your job to decide what the facts of the case are. You must decide which witnesses you believe and how important you think their testimony

15

is. You do not have to accept or reject everything a witness said. You are free to believe all, none, or any part of a person's testimony.

In deciding which testimony you believe, you should rely on your own common sense and everyday experience. However, in deciding whether you believe a witness' testimony, you must set aside any bias or prejudice you may have based on the race, gender or national origin of the witness.

There is no fixed set of rules for judging whether you believe a witness, but it may help you to think about these questions:

Was the witness able to see and hear clearly?

How long was the witness watching or listening?

Was anything else going on that might have distracted the witness?

Did the witness seem to have a good memory?

How did the witness look and act while testifying?

Did the witness seem to be making an honest effort to tell the truth or did the witness seem to evade the questions or argue with the lawyers?

Does the witness' age or maturity affect how you judge his or her testimony?

Does the witness have any bias, prejudice, or personal interest in how this case is decided?

Have there been any promises, threats, suggestions or other influences that affected how the witness testified?

In general, does the witness have any special reason to tell the truth or any special reason to lie?

All in all, how reasonable does the witness' testimony seem when you think about all the other evidence in the case?

Sometimes the testimony of different witnesses will not agree and you must decide which testimony you accept.

You should think about whether the disagreement involves something important or not and whether you think someone is lying or simply mistaken.

People see and hear things differently, and witnesses may testify honestly, but simply be wrong about what they thought they saw or remembered.

It is also a good idea to think about which testimony agrees best with the other evidence in the case.

However, you may conclude that a witness deliberately lied about something that is important to how you decide the case. If so, you may choose not to accept anything that witness said.

On the other hand, if you think the witness lied about some things but told the truth about others, you may simply accept the part you think is true and ignore the rest.

Tr. Vol. III at 131-133.

These instructions are identical in all material respects to those in *Young* which the Sixth Circuit held both sufficiently informed the jury regarding credibility and alerted the jury to what was properly considered when determining credibility, and, in light of which, the failure to give a specific accomplice jury instruction did not violate a criminal defendant's constitutional rights. *Young*, 435 F. App'x at 504-05 ("Because the totality of this instruction both informs the jury regarding credibility and alerts the jury to what is properly considered when determining credibility, the failure to give a specific accomplice instruction did not violate [Young's] constitutional rights.") (internal citations and quotations omitted). The Court finds Faulk's jury was properly instructed and the failure to give a specific accomplice instruction did not deprive Faulk of a fair trial.

III.   Habeas Claim 3:  Prosecutorial Misconduct

Faulk's third habeas claims asserts that he was denied due process and his constitutional right to a fair trial when the prosecutor engaged in misconduct by (A) forcing Faulk to comment on the credibility of prosecution witnesses; (B) making a absent witness an accessory to a crime with no evidence in support; (C) failing to disclose impeachment evidence and correct false testimony; and (D) making statements in his closing arguments unsupported by evidence. Petition at 32. Wood argues that these claims are procedurally

17

defaulted because Faulk's counsel did not object to the prosecutor's conduct at trial and the Michigan Court of Appeals relied upon this failure in limiting its review to plain error. Resp. to Petition at 29. Faulk argues that his trial counsel was constitutionally ineffective for failing to object to the prosecutorial misconduct, and this failure should provide cause to excuse the default. Petition at 32. As with Faulk's jury instruction claim, the Court finds it simpler to address the merits of Faulk's claim rather than first address the question of procedural default. *See Lambrix*, 520 U.S. at 525.

Prosecutorial misconduct may form the basis for habeas relief if the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

A.    Forcing Comment on the Credibility of Witnesses

Faulk asserts that the prosecutor committed misconduct when he forced Faulk to comment on the credibility of the State's witnesses. Petition at 33.

The Michigan Court of Appeals rejected this claim on the merits as follows:

> It is improper for the prosecutor to ask one witness to comment on the credibility of another witness. *People v. Ackerman*, 257 Mich. App 434, 449 (2003). Here, however, the prosecutor did not directly ask defendant to comment on the credibility of the juvenile witnesses' testimony, but only asked defendant if he knew of any reason why the juveniles would be biased against him or would want to frame him for a crime he did not commit. Defendant had previously testified that, contrary to the juveniles' testimony, he was not involved in the offense. The prosecutor was entitled to explore this defense theory on cross-examination. *People v. Watson*, 245 Mich. App 572, 592-593 (2001). Considered in the context of defendant's direct examination testimony, the prosecutor's line of questioning did not constitute plain error. *Id.*; *People v. Kennebrew*, 220 Mich. App 601, 608 (1996).

*Faulk*, 2008 WL 7470183 at *2.

18

A review of the record shows that the Michigan Court of Appeals neither unreasonably applied *Darden* nor unreasonably determined the facts in rejecting this prosecutorial misconduct claim. Michigan law does hold that it is improper for a prosecutor to ask a criminal defendant to comment on the credibility of witnesses, because the defendant's opinion of their credibility is irrelevant. *People v. Buckley*, 424 Mich. 1, 12 (1985). The Michigan Court of Appeals, however, reasonably concluded based on the record that the prosecutor's questions did not ask Faulk to comment on the credibility of the prosecution's witnesses, but rather permissibly asked Faulk questions about whether he knew of any bias or incentive to lie, given that his testimony was that they were lying. When a criminal defendant "assumes the role of a witness, the rules that generally apply to other witnesses – rules that serve the truth-seeking function of the trial – are generally applicable to him as well." *Portuondo v. Agard*, 529 U.S. 61, 69 (2000) (quoting *Perry v. Leeke*, 488 U.S. 272, 282 (1989)). Regardless, there is no United States Supreme Court authority for the proposition that "a prosecutor's questions simply calling for answers that are inadmissible due to relevancy" constitutes prosecutorial misconduct that rises to the level of a Due Process violation. *Wade v. White*, 120 Fed. Appx. 591, 594 (6th Cir. 2005) (Michigan Court of Appeals determination was not contrary to U.S. Supreme Court precedent regarding "answers inadmissible due to relevancy"). The Michigan Court of Appeals' conclusion is not unreasonable or contrary to established precedent, and Faulk's first prosecutorial misconduct claim therefore lacks merit.

B.   Allegations of Absent Witness as Accessory

Faulk argues that the prosecutor committed misconduct by suggesting that Faulk's girlfriend was involved in the crimes. Petition at 36.

During closing arguments, the prosecutor argued:

Why is his girlfriend driving around the same area where he allegedly is? Why is she driving around? I submit to you she's not driving around there because she happens to be driving through the neighborhood, but maybe she's there to pick up the defendant because she knows that he's running from the police because he has called her some way. Why is she there? I submit to you that is something to think about.

Tr. Vol. III at 83.

The Michigan Court of Appeals found no plain error in Faulk's second claim of prosecutorial misconduct, holding:

The prosecutor's comment concerning the possible involvement of defendant's girlfriend was supported by the juveniles' testimony that defendant was present in the neighborhood during the offense and his girlfriend was in the neighborhood at the same time or shortly thereafter. A prosecutor is free to comment on the evidence and draw reasonable inferences from the evidence. *People v. Marji*, 180 Mich. App 525, 538 (1989). There was no plain error.

*Faulk*, 2006 WL 747083 at *2.

A review of the record shows that the Michigan court reasonably concluded that the prosecutor did not commit misconduct in the portion of his closing argument regarding Faulk's girlfriend. The prosecutor's statement asks the jury to draw a reasonable inference from the evidence admitted at trial that Faulk was seen talking on a cell phone and that Faulk's girlfriend was stopped in the vicinity of where the crime occurred and where Faulk was found. *See Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (quoting *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir.1996)) (prosecutors are given "leeway to argue reasonable inferences from the evidence."). The statement was supported by evidence admitted at trial, and was therefore not improper, nor did it deny Faulk a fair trial; nor did the Michigan Court of Appeals unreasonably conclude the same.

20

C.    Failing to Disclose Impeachment Evidence and Not Correcting False Testimony

Faulk's third claim of prosecutorial misconduct asserts that the prosecutor committed misconduct by misrepresenting the nature of the plea agreements entered into by the juveniles and by failing to correct their false testimony. Faulk asserts that the prosecutor claimed in his opening statement that the boys were not offered anything for their testimony. Faulk argues that this was misconduct because the boys testified that they were required to cooperate and testify against Faulk in order to have their cases put on the consent calender and ultimately dismissed. Petition at 38.

The prosecutor's opening statement, even if technically incorrect, did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. Faulk's counsel thoroughly explored the juvenile's consent calender pleas, and  the jury was well aware of the fact that the witnesses were required to testify against Faulk in order to have their own convictions expunged. *See, e.g.*, Tr. Vol. I at 311-313 ("Q: So you can get the case dismissed if you cooperate and testify here. A: Yes, sir."). In light of this, any contrary inference to be drawn by the prosecutor's opening statement did not so infect Faulk's trial with unfairness as to deny him his due process right to a fair trial. *See generally Slagle v. Bagley*, 457 F.3d 501, 528 (6th Cir. 2006) (statements did not infect trial when curative instruction was given).

Faulk also argues that the prosecutor failed to provide evidence of the juveniles' plea agreements. Petition at 43. The Michigan court rejected this claim on direct appeal:

> Constitutional claims of due process violations are reviewed de novo. *People v. Pitts*, 222 Mich. App 260, 263 (1997). Under *Brady v. Maryland*, 373 U.S. 83 (1963), "[a] criminal defendant has a due process right of access to certain information possessed by the prosecution." *People v. Lester*, 232 Mich. App 262, 281(1998). "This due process requirement of disclosure applies to evidence that might lead a jury to entertain a reasonable doubt about a

21

defendant's guilt." *Id.* at 281. "Impeachment evidence as well as exculpatory evidence falls within the *Brady* rule because, if disclosed and used effectively, such evidence 'may make the difference between conviction and acquittal.' " *Id.* (citation omitted).

"In order to establish a *Brady* violation, a defendant must prove: (1) that the state possessed evidence favorable to the defendant; (2) that he did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different." *Id.* at 281-282. "The failure to disclose impeachment evidence does not require automatic reversal even where ... the prosecution's case depends largely on the credibility of a particular witness." *Id.* at 282 (emphasis added). Rather, "[t]he court must still find the evidence material," i.e., a reasonable probability that, if disclosed, the evidence might have affected the outcome. *Id.*

"In general, impeachment evidence has been found to be material where the witness at issue supplied the only evidence linking the defendant to the crime or where the likely effect on the witness' credibility would have undermined a critical element of the prosecution's case." *Id.* at 282-283. "In contrast, a new trial is generally not required where the testimony of the witness is corroborated by other testimony or where the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *Id.* at 283.

In this case, defendant complains that he did not receive the juveniles' police statements until three days before trial. It is undisputed, however, that the statements were disclosed, were introduced into evidence, and were used for impeachment. Defendant does not allege any prejudice resulting from any delay in providing the statements. Because the statements were disclosed, there was no *Brady* violation.

Defendant also alleges that he was prejudiced by the prosecutor's failure to turn over the juveniles' probate court testimony. However, there has been no showing that such testimony existed, let alone that it would have been useful for impeachment. Defendant similarly alleges that he was prejudiced by the prosecutor's failure to turn over the juvenile's criminal and probate court records. Again, however, there has been no showing, nor is there any indication in the record, that any of the juveniles had a prior criminal record, let alone a criminal record that could have been used for impeachment under MRE 609(a).

*Faulk,* 2008 WL 747083 at *4-5.

The Court finds the Michigan Court of Appeals reasonably applied *Brady* in light of the facts in the record. There is no evidence that the prosecution withheld evidence favorable to the defendant, and the impeachment evidence that Faulk claims to have been withheld was explored by Faulk's attorney on cross-examination and in his closing argument. Faulk's third prosecutorial claim lacks merit and will be denied.

D.    Statements in Closing Arguments Unsupported by Evidence

Faulk argues that the prosecutor committed misconduct in his closing argument by arguing that Faulk's sister was afraid of her brother. Faulk asserts that this was misconduct because Faulk's sister denied she was afraid. Petition at 45.

The Michigan Court of Appeals considered this claim as follows:

> We also reject defendant's argument that the prosecutor falsely stated that defendant's sister was afraid of defendant. The transcript discloses that the prosecutor did not argue that defendant's sister was afraid of defendant, but rather argued, on the basis of the evidence, that defendant's sister was "hiding" and urged the jurors to rely on their collective memories for the rest of her testimony. The prosecutor's questions to defendant and his sister, and the prosecutor's closing argument, were based on the evidence and reasonable inferences arising therefrom. There was no plain error.

*Faulk*,  2008 WL 747083 at *1-3.

A review of the record supports the Michigan Court of Appeals' determination. In his closing, the prosecutor told the jury that Ilene Faulk testified that all the doors were locked, that Faulk tried breaking into every door at the house, and that she was hiding on the kitchen floor. Tr. Vol III at 79-80. Prosecutors are permitted to argue the evidence and reasonable inferences from the evidence. *See Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000). The prosecutor closing asked the jury to draw a reasonable inference from Ilene Faulk's testimony and therefore did not constitute misconduct, or a violation of Faulk's right to a fair trial.

23

Overall, Faulk has not shown that prosecutorial misconduct occurred during his trial that denied him due process and a fair trial, or that the Michigan Court of Appeals unreasonably applied controlling law in finding the same. He is not entitled to habeas relief on his third claim.

IV.   Habeas Claim 4: Ineffective Assistance of Trial Counsel

Faulk's fourth claim for habeas relief asserts that he was deprived of his right to the effective assistance of counsel when his trial attorney failed to (A) interview and call witnesses for the defense; (B) failed to investigate, obtain, and produce plea agreements for impeachment purposes; (C) failed to object to prosecutorial misconduct; and (D) failed to properly cross-examine prosecution witnesses. Petition at 47.

To show that Faulk was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court set forth the two-pronged test for determining whether a petitioner has received ineffective assistance of counsel. First, the petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. *Id.* at 687. Second, the petitioner must establish that the deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id.*

With respect to the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. *Id.* at 690. A reviewing court's scrutiny of defense counsel's performance is highly deferential, and defense counsel is presumed to have rendered adequate assistance

24

by exercising reasonable professional judgment and sound trial strategy. *Id.* at 689. The petitioner must overcome the presumption that, under the circumstances, the challenged actions might be considered sound trial strategy. *Id.*

With respect to the prejudice prong, when reviewing prejudice, a court must consider all of the evidence and determine "whether there is a reasonable probability that, absent errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

When a state court reaches the merits of an ineffective assistance of counsel claim, as is the case here, habeas review is even more deferential. In order to obtain habeas relief on an ineffective assistance of counsel claim denied on the merits by a state court, a petitioner must show that the state court's rejection of the claim was unreasonable. *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). So long as fair minded jurists could debate whether the state court's decision was reasonable, a federal court may not grant habeas relief in light of a state court decision on the merits to the contrary.

Faulk first argues that his counsel was constitutionally ineffective because he failed to call Faulk's brother, Stephen Faulk, to testify that Faulk was not with the juveniles when they went garage hopping. Specifically, Faulk argues that Stephen Faulk would have testified that Faulk called him with one of the boys' cell phones at 7:16 p.m. and told Stephen that Faulk was at his mother's house waiting to get in with some kids; and that when Stephen called back at 7:58 p.m., one of the juveniles answered and told him that Faulk was no longer with the juveniles. Petition at 52-53. Stephen Faulk's statements, however, are inadmissible hearsay because Faulk would offer then for the purposes of establishing their truth, and Faulk offers no alternative basis for admitting them. *See, e.g.*, *United States v. Boyd*, 640 F.3d 657, 663 (6th Cir. 2011) cert. denied, 132 S. Ct. 271

(2011). Faulk's own testimony establishes that Stephen Faulk was neither present at the scene of the crimes nor was he with his brother at the time and therefore he would have had no personal knowledge of whether Faulk was present or not. *See* Tr. Vol III at 10. Since the testimony that Faulk argues his counsel should have presented was inadmissible hearsay, Faulk fails to show that his trial counsel was ineffective for failing to call Stephen Faulk. *See Beauchamp v. McKee*, 488 F. App'x 987 (6th Cir. 2012)

Faulk also argues that his trial counsel was ineffective because he failed to investigate, obtain, and produce the juvenile's plea agreements for impeachment purposes. Petition at 58. The Michigan Court of Appeals rejected this claim, finding:

> . . . there is no record support for defendant's claims regarding the existence of photographs, a list of items that defendant allegedly wanted counsel to investigate, or the juveniles' alleged probate court records. Even if these items existed, defendant has failed to show how they would have been useful, or demonstrated that counsel's alleged failure to investigate these matters deprived him of a substantial defense.

*Faulk*, 2008 WL 747083 at *6.

While failure to investigate properly may constitute ineffective assistance of counsel, *see generally Wiggins v. Smith*, 539 U.S. 510, 524 (2003), the Michigan Court of Appeals found there was no evidence in the record that these plea agreements existed or that they would have been useful for impeachment purposes. *See generally Goldsby v. United States*, 152 F. App'x 431, 436 (6th Cir. 2005) (no ineffective assistance when failing to call witness who would not actually support defendant's case). Faulk fails to meet his burden of showing that this determination was based on an unreasonable determination of the facts or was an unreasonable application of *Strickland*.

Faulk also argues that his trial counsel was ineffective because he failed to object to what Faulk claims were instances of prosecutorial misconduct. Petition at 63.

> Defendant also argues that defense counsel was ineffective for failing to object to the prosecutor's conduct. As discussed in section II, *supra*, there is no merit to defendant's claims of prosecutorial misconduct. Therefore, counsel was not ineffective for failing to object. *People v. Kulpinski*, 243 Mich.App 8, 27; 620 NW2d 537 (2000).

*Faulk*, 2008 WL 747083 at *7. As similarly discussed in this opinion, the instances of misconduct that Faulk claims should have been objected to were either not misconduct or insufficiently serious to deny Faulk a fair trial, and therefore do not form the basis for a claim of ineffective assistance of counsel. *See, e.g.*, *Donaldson v. United States*, 379 F. App'x 492, 493 (6th Cir. 2010) (cannot meet second *Strickland* ineffective assistance prong if counsel did not object to actions that were not actually misconduct).

Finally, Faulk argues that his trial counsel was ineffective because he failed to clarify testimony of Faulk's sister that appeared to state that Faulk was not allowed in his mother's house; Faulk asserts that in fact it was the juveniles that were not allowed in their mother's house, and this fact could have been clarified with better cross-examination. Petition at 63.

Faulk fails to meet his burden of establishing either prong of the *Strickland* test with regard to his counsel's cross-examination of his sister. Faulk's trial counsel could reasonably have concluded that further cross-examination of Faulk's sister might have resulted in more damaging testimony, rather than the helpful testimony that Faulk speculates would have resulted, and might have reasonably chosen to limit the time spent on why Faulk's sister hid when he attempted to enter the house. Faulk fails to overcome the presumption that his counsel's decision whether or not to question his sister further on this topic constituted sound trial strategy. *See Strickland*, 466 U.S. at 689. Furthermore, Faulk cannot establish that his counsel's failure to cross-examine Ilene on this matter prejudiced the defense. To establish prejudice under *Strickland*, Faulk "must show that

there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The question whether or not Faulk was permitted in his mother's house with or without the boys is entirely collateral to the basic question of whether Faulk participated in the crimes for which he was convicted. It is not reasonably probable that the result of the trial would have been different if Faulk's counsel had cross-examined Ilene on this matter. Overall, the Court finds the Michigan Court of Appeals reasonably applied *Strickland* in rejecting his ineffective assistance of counsel claims, and is therefore not entitled to habeas relief on this claim.

## V.     Habeas Claim 5: Cumulative Error

Faulk's fifth claim for habeas relief asserts that, taken together, the errors that occurred in the course of his trial denied him due process and a fair trial. Petition at 65. Claims of cumulative constitutional errors, however, are not cognizable on habeas review. *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) ("[The Sixth Circuit] held that, post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief"). Faulk is not entitled to habeas relief on his fifth claim.

## VI.     Certificate of Appealability

Before Faulk may appeal this decision, the reviewing court must issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable

28

jurists would find the court's assessment of the constitutional claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 327 (2003). The Court concludes that Faulk has failed to make a substantial showing of the denial of a constitutional right. A certificate of appealability is not warranted.

## CONCLUSION

Faulk has failed to establish that he is being held in custody in violation of the Constitution or laws or treaties of the United States. The Court will therefore deny the petition for writ of habeas corpus and decline to issue a certificate of appealibilty.

## ORDER

**WHEREFORE** it is hereby **ORDERED** that Faulk's Petition for a Writ of Habeas Corpus is **DENIED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the Court **DECLINES** to issue a certificate of appealability.

**SO ORDERED**.


s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: January 31, 2013

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 31, 2013, by electronic and/or ordinary mail.

s/Carol Cohron
Case Manager